**ALPHA LYRACOM SPACE COMMUNICATIONS, INC., a Delaware Corporation; Reynold V. Anselmo, an individual, doing business as Pan American Satellite, a sole proprietorship, Plaintiffs–Appellants,**

v.

**COMMUNICATIONS SATELLITE CORPORATION, Defendant–Appellee.**

No. 977, Docket 90–7893.

United States Court of Appeals, Second Circuit.

Argued April 22, 1991.

Decided Sept. 30, 1991.

Joseph M. Alioto, San Francisco, Cal. (Alioto and Alioto, San Francisco, Cal., Daniel R. Shulman, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., and David L. Marks, Marks and Marks, New York City, on the brief), for plaintiffs-appellants.

A. Duncan Whitaker, Washington, D.C. (Alan M. Wiseman, Mark D. Wegener, Jerrold J. Ganzefried, Howrey & Simon, Washington, D.C., Thomas J. Sweeney, III, Davis, Markel & Edwards, New York City, and Willard R. Nichols, Warren Y. Zeger, Keith H. Fagan, Communications Satellite Corp., Washington, D.C., on the brief), for defendant-appellee.

Before NEWMAN and KEARSE, Circuit Judges, and STANTON, District Judge.*

* The Honorable Louis L. Stanton of the District Court for the Southern District of New York, sitting by designation.

JON O. NEWMAN, Circuit Judge:

This appeal concerns primarily the issue whether the Communications Satellite Corporation ("COMSAT") is immune from antitrust liability for activity undertaken in its role as the United States representative to the International Telecommunications Satellite Organization ("INTELSAT"). The issue arises on an appeal from the September 14, 1990, judgment of the District Court for the Southern District of New York (John F. Keenan, Judge) dismissing the complaint of plaintiffs Alpha Lyracom Space Communications, Inc. and Reynold V. Anselmo, doing business as Pan American Satellite, (collectively "PanAmSat") alleging that COMSAT violated the antitrust laws and tortiously interfered with their relations with prospective customers. COMSAT, a private corporation created by the Communications Satellite Act of 1962 ("CSA"), 47 U.S.C. § 701 *et seq.* (1988), serves as the United States' "signatory" to INTELSAT. INTELSAT and its 119 nation members and their designated signatories collectively maintain and operate an international network of telecommunications satellites, ground stations, and other satellite support facilities. PanAmSat, owner and operator of the first international commercial communications satellite outside of INTELSAT, brought suit alleging that COMSAT, through INTELSAT and in conjunction with other signatories, engaged in a variety of anticompetitive practices in the market for international commercial satellite telecommunications services. We conclude that dismissal on the ground of immunity was proper, but because appellants are entitled to an opportunity to amend their complaint to replead allegations that might not encounter an immunity defense, we reverse and remand.

## Background

*The Regulatory Framework.* Congress enacted the Communications Satellite Act of 1962 to implement the national policy of

establishing "in conjunction and in cooperation with other countries, as expeditiously as practicable a commercial communications satellite system." 47 U.S.C. § 701(a). Rather than relying solely on governmental efforts, Congress sought to "provide for the widest possible participation by private enterprise," 47 U.S.C. § 701(c), by creating COMSAT, a publicly held, private corporation, 47 U.S.C. §§ 731, 734(a), to act "subject to appropriate governmental regulation," 47 U.S.C. § 701(c), as the "United States participa[nt] in the global system." *Id.* Under the Act, COMSAT assumed responsibility for planning, constructing, and operating the satellite system, including satellite terminal stations, 47 U.S.C. § 735(a)(3), "itself or in conjunction with foreign governments," 47 U.S.C. § 735(a)(1), and for leasing space satellite telecommunications channels to communications common carriers, 47 U.S.C. § 735(a)(2).

The Act imposes a duty on COMSAT to "comply ... with all provisions of th[e] chapter," 47 U.S.C. § 743(c), and authorizes a district court, on application of the Attorney General, to enjoin COMSAT from taking any action or adopting any practices or policies inconsistent with "the policy and purposes declared in section 701" of the Act, *id.* § 743(a). Section 701(c) declares the general intent of Congress to foster competition in the operation of, and provision of equipment, services, and access to, the satellite network. Section 701(c) concludes with the so-called "antitrust consistency clause," which provides that:

> [T]he activities of the corporation created under this chapter and of the persons or companies participating in the ownership of the corporation shall be consistent with the Federal antitrust laws.

In 1964, two years after passage of the Act, the United States and ten other nations entered into an interim executive agreement that created the International Telecommunications Satellite Organization (INTELSAT). *See Agreement Establishing Interim Arrangements for a Global Communications Satellite System*, Aug. 20, 1964, 15 U.S.T. 1705. The member-nations later executed two additional executive agreements formalizing the ground rules for INTELSAT's control and management of the international satellite network and related support facilities. These agreements are known as "the Definitive Agreement" and "the Operating Agreement." The Definitive Agreement (officially, *Agreement Relating to the International Telecommunications Satellite Organization 'INTELSAT'* ") was executed by the government of each member-nation. It established a three-tiered organizational structure for INTELSAT, comprising the Assembly of Parties, the Meeting of Signatories, and the Board of Governors. Each member-nation or "Party" has a seat on the Assembly of Parties, and each member's designated "Signatory" to the Operating Agreement (officially, *Operating Agreement Relating to the International Telecommunications Satellite Organization 'INTELSAT'* ") is represented in the Meeting of Signatories and the Board of Governors. The United States designated the State Department as its representative to the Assembly of Parties and COMSAT as its signatory and representative to the Meeting of Signatories.

Together, the Definitive and Operating Agreements give the Assembly of Parties, the Meeting of Signatories, and the Board of Governors virtually plenary authority to set rates for use of INTELSAT satellite capacity, Definitive Agreement Arts. V(d), VIII(b)(v)(C), X(a)(viii); Operating Agreement Art. 8(a), to approve INTELSAT's purchases of goods and services, Definitive Agreement Arts. X(a)(ii), XIII; Operating Agreement Art. 16, and to approve proposals to establish international and domestic telecommunications satellite systems separate from INTELSAT. In particular, an applicant for a separate system providing *international* satellite service must engage in "consultation" with the Assembly of Parties and the Board of Governors to ensure the technical compatibility of its system with INTELSAT and to guard against the possibility that the competing system might result in "significant economic harm" to INTELSAT. Definitive Agreement Art. XIV(d). Those seeking to pro-

vide separate *domestic* satellite services need "consult" only with the Board of Governors to ensure technical compatibility. *Id.* Art. XIV(c).

In 1976, the United States, as host country of INTELSAT, entered into an agreement with INTELSAT known as the Headquarters Agreement. Among other things, this agreement includes an immunity provision central to this litigation.

After the creation of INTELSAT, the Executive Branch continued to exercise its substantial authority under the Communications Satellite Act to oversee and regulate COMSAT's management and operation of the system and its relations with foreign governments and their designated satellite management entities, 47 U.S.C. §§ 721, 732–33, 742. Pursuant to the directive in section 721(a)(4) to oversee COMSAT's relations with foreign governments, Executive Order No. 12,046 specifies that "[w]ith respect to telecommunications, the Secretary of State shall exercise primary authority for the conduct of foreign policy, including the determination of United States positions and the conduct of United States participation in negotiations with foreign governments and international bodies." 43 Fed.Reg. 13,349, 13,354 (1978). In particular, the Secretary should "instruct[ ] [COMSAT] in its role as the designated United States representative to [INTELSAT]" and "direct the foreign relations of the United States with respect to actions under the Communications Satellite Act of 1962." *Id.; see also Procedures for U.S. Government Instruction of the Communications Satellite Corporation in its Role as U.S. Representative to the Interim Communications Satellite Commission,* 77 F.C.C.2d 564 (1980); 1984 Memorandum of Understanding among the Departments of State and Commerce and the Federal Trade Commission.

The Definitive and Operating Agreements each include provisions that contemplate the possible imposition of legal liability against INTELSAT signatories. Article XV(c) of the Definitive Agreement provides:

Each Party other than the Party in whose territory the headquarters of INTELSAT is located [the United States] shall grant in accordance with the Protocol referred to in this paragraph, and *the Party in whose territory the headquarters of INTELSAT is located [the United States] shall grant in accordance with the Headquarters Agreement ... the appropriate* privileges, exemptions and *immunities* to INTELSAT, to its officers, and to those categories of its employees specified in such Protocol and Headquarters Agreement, to Parties and representatives of Parties, *to Signatories and representatives of Signatories* and to persons participating in arbitration proceedings. In particular, *each Party shall grant to these individuals immunity from legal process in respect of acts done or words written or spoken in the exercise of their functions and within the limits of their duties, to the extent and in the cases to be provided for in the Headquarters Agreement and Protocol referred to in this paragraph.*

Definitive Agreement Art. XV(c) (emphasis added). The United States, in fulfillment of its obligations under Article XV(c), provided in paragraph 16 of the Headquarters Agreement that the

officers and employees of INTELSAT, *the representatives of the Parties and of the Signatories* ... shall be immune from suit and legal process relating to acts performed by them in their official capacity and falling within their functions, except insofar as such immunity may be waived by the head of the executive organ of INTELSAT for its officers and employees, [and] by the Parties and Signatories for their representatives....

*United States Policy on Separate Satellite Systems.* Beginning in 1983, several U.S. companies, including PanAmSat, lobbied the FCC for permission to establish non–INTELSAT international telecommunications satellite systems. The Communications Satellite Act made only a passing reference to competing satellite systems, authorizing the President to explore the possibility of "a separate communications satellite system" where "required to meet

unique governmental needs" or where "otherwise required in the national interest." 47 U.S.C. § 721(a)(6). In 1984, President Reagan, acting pursuant to §§ 701(d) and 721(a) of the Act, issued Presidential Determination No. 85–2, declaring separate international communications satellite systems to be "in the national interest" and directing the Secretary of State and the Secretary of Commerce to "inform the Federal Communications Commission of criteria necessary to ensure [that] the United States" fulfill its obligation to consult with the appropriate INTELSAT bodies regarding competing satellite systems. 49 Fed. Reg. 46,987 (1984). The Departments of State and Commerce jointly prescribed that each alternative system "be restricted to providing services through the sale or long-term lease of transponders or space segment capacity for communications not interconnected with public-switched message networks" and that "one or more foreign authorities are to authorize use of each system and enter into consultation procedures with the United States Party under Article XIV(d) of the INTELSAT [Definitive] Agreement to ensure technical compatibility and to avoid significant economic harm." Letter from Secretary of State George P. Schultz and Secretary of Commerce Malcolm Baldridge to Chairman Mark S. Fowler of the Federal Communications Commission (Nov. 28, 1984).

The Foreign Relations Authorization Act (FRAA), Fiscal Years 1986 and 1987, Pub.L. No. 99–93, 99 Stat. 405, 425–26 (1985), ratified the procedures set forth in the Definitive Agreement and in the subsequent Executive Branch directives on competing satellite systems. Expanding on section 721(a)(6) of the Communications Satellite Act, the FRAA declared the policy of the United States to make available, in addition to satellite services utilizing INTELSAT facilities, "any additional such facilities ... found to be in the national interest" and that also met the dual requirements of technical feasibility and avoidance of economic harm set forth in Article XIV(d) of the Definitive Agreement. *Id.* at § 146(a)(2). The FRAA also made compliance with the requirements set forth in Presidential Determination No. 85–2 and the requirement that "one or more foreign authorities have authorized the use of such system consistent with such conditions" a precondition of consultation with INTELSAT. *Id.* at § 146(b)(1), (2).

The FCC subsequently released a report on September 3, 1985, regarding the applications by U.S. companies to build and operate competing satellite systems. *In re Establishment of Satellite Systems Providing International Communications*, FCC Docket No. 84–1299 (July 25, 1985). While generally approving alternative systems, the FCC also conditioned the issuance of licenses on successful Article XIV(d) consultations. Following Article XIV(d) consultations, PanAmSat obtained approval from INTELSAT's Assembly of Parties to provide international satellite services to the United Kingdom, Germany, Ireland, and several Central and South American countries. PanAmSat also received favorable findings from the Board of Governors following Article XIV(c) consultations for the provision of domestic satellite services to the United Kingdom and Chile.[1]

*Proceedings before the District Court.* PanAmSat's amended complaint sought damages and injunctive relief for alleged violations of Sections 1 and 2 of the Sherman Anti-Trust Act, 15 U.S.C. §§ 1, 2 (1988), and for tortious interference with PanAmSat's business relations with prospective customers. Each of these counts was founded on the same set of underlying factual allegations. The complaint charged COMSAT, acting in tandem with INTELSAT, with various anticompetitive acts directed at competing satellite systems, such as passing a resolution to boycott competing systems, delaying Article XIV(c) and Article XIV(d) consultations, pricing satellite telecommunications services without regard to cost, and purchasing excess satel-

---

1. At the time the appeal was heard but subsequent to the District Court's decision, PanAmSat secured favorable Article XIV(c) and (d) consultations with respect to a number of other countries.

lite capacity. In addition, COMSAT was alleged to have entered into anticompetitive cooperative arrangements with particular signatories. For example, the complaint alleged that COMSAT had entered into an agreement with various European signatories to provide "end-to-end" service and to set prices without regard to cost and had formed separate joint ventures with several South American signatories. Finally, PanAmSat charged COMSAT, acting alone, with several anticompetitive acts, such as filing a sham opposition to Reynold V. Anselmo's application to obtain a federal income tax deferral for the development, purchase, and launch of a telecommunications satellite, refusing to do business with PanAmSat, and representing to various potential customers that PanAmSat would be unable timely to obtain adequate satellite capacity or to complete INTELSAT consultations.

The District Court granted COMSAT's motion to dismiss without reaching the merits of PanAmSat's anti-trust claims, relying primarily on the grant of immunity in paragraph 16 of the Headquarters Agreement. The Court construed this immunity to "the representatives of the Parties" "from suit and legal process relating to acts performed by them in their official capacity and falling within their functions" to apply to Signatories, such as COMSAT. In addition, Judge Keenan concluded that the antitrust consistency clause in the Communications Satellite Act of 1962 did not apply to actions taken by COMSAT as Signatory to INTELSAT but required only those activities undertaken as a common carrier to conform with the antitrust laws. Implicit in the District Judge's opinion is the view that the complaint alleges actions by COMSAT only in its capacity as signatory to INTELSAT and not in its capacity as a common carrier. In the alternative, Judge Keenan ordered dismissal under Fed.R.Civ.P. 12(b)(7) for failure to join INTELSAT, its member-nations, and their signatories as necessary and indispensable parties under Fed.R.Civ.P. 19. Implicit in this ruling too is the view that the allegations against COMSAT concern actions by COMSAT only in its role as signatory to

INTELSAT. Finally, the Court dismissed PanAmSat's pendent state law claim for interference with prospective advantage for failing to identify, as required by New York law, the prospective contractual relationship or relationships that would have been consummated *but for* COMSAT's allegedly wrongful interference.

### Discussion

■ Appellants challenge the District Court's interpretation of paragraph 16 of the Headquarters Agreement. That paragraph confers immunity from suit and legal process upon a class defined to include "[t]he officers and employees of INTELSAT, the representatives of the Parties and of the Signatories and persons participating in arbitration proceedings pursuant to the INTELSAT Agreement." Members of the class enjoy immunity from suit "relating to acts performed by them in their official capacity and falling within their functions." The issue is whether the phrase "representatives of the Parties" includes signatories.

Appellants point out that if the paragraph had been intended to cover signatories, a more straightforward phrasing of the immune class would have been "the Parties, the Signatories, and their representatives." Moreover, appellants continue, language in paragraphs preceding and following paragraph 16 arguably applies only to natural persons, reenforcing the argument that paragraph 16 applies to the individuals who act as representatives of either parties or signatories, but not to the entities themselves. Though these contentions have some force, we think other considerations indicate that the District Court's interpretation was correct.

The Headquarters Agreement implements the Definitive Agreement. The Definitive Agreement requires each party to grant appropriate immunities "to INTELSAT ... to Parties and representatives of Parties, *to Signatories* and representatives of Signatories." Definitive Agreement Art. XV(c) (emphasis added). Though this phrasing arguably distinguishes between "representatives of Parties" and "Signato-

ries," its primary significance lies in its explicit direction to immunize "Signatories." It is true that the Definitive Agreement directs extension of immunity "to the extent and in the cases to be provided for in the Headquarters Agreement," thereby leaving the scope of immunity to the subsequent document, but that qualification does not suggest that the Headquarters Agreement should be understood to exclude signatories entirely from the category receiving whatever degree of immunity is to be conferred. Indeed, one strong reason for reading the Headquarters Agreement to include signatories in its grant of immunity is the absence of any indication that the odd arrangement resulting from a contrary interpretation was intended: since the parties themselves will enjoy sovereign immunity, appellant's reading would extend immunity to the parties, to INTELSAT, and to the individual representatives of the parties and the signatories, but not to the signatories themselves, at least not to those signatories, like COMSAT, that are not themselves member nations.

Moreover, it places no strain on the phrase "representatives of the Parties" to place signatories within that category. COMSAT is "the designated United States representative to" INTELSAT, *see* Executive Order No. 12,046. Though the ultimate issue is what the drafters of the Headquarters Agreement meant, not how others regard COMSAT, it is not insignificant that appellant's complaint repeatedly characterizes COMSAT as "the United States representative." Complaint ¶¶ 11, 28(a), 28(b), 28(c).

Finally, as Judge Keenan recognized, exposure of COMSAT to antitrust liability *in its role as United States signatory to INTELSAT* is entirely inconsistent with the responsibilities Congress entrusted to COMSAT under the CSA. "Congress could not have intended to require Comsat to participate in Intelsat subject to Executive Branch directives and, at the same time, have intended that Comsat proceed at its own antitrust peril in carrying out that official role." *Alpha Lyracom Space Communications, Inc. v. Communications Satellite Corp.*, 1990–2 Trade Cases

¶ 69,188, at 64,583, 1990 WL 135637 (S.D.N.Y. Sept. 13, 1990), *cf. Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 56–57, 105 S.Ct. 1721, 1726–1727, 85 L.Ed.2d 36 (1985) (private parties acting at direction of state officials or agencies are entitled to same "state action" antitrust immunity that applies to those officials or agencies); *Cine 42nd St. Theater Corp. v. Nederlander Organization*, 790 F.2d 1032, 1048 (2d Cir. 1986) (same). COMSAT, as United States signatory to INTELSAT, must participate in the consultations that determine to what extent competing satellite systems will be permitted under Article XIV(d) of the Definitive Agreement. Having created COMSAT to wield monopoly power, along with the other participants in a global satellite system, Congress did not expect that corporation to face antitrust liability in deciding, as a member of INTELSAT, whether and to what extent to permit competition.

█ We also agree with Judge Keenan that the "antitrust consistency clause" in section 701(c) of the CSA applies only to COMSAT's role (and that of its owners) as common carrier and not to its role as United States representative to INTELSAT. The principal antitrust concern voiced within Congress during the consideration of the CSA, once the fundamental decision was made to create a private corporation with monopoly powers, was that the common carriers participating in ownership of COMSAT would use their ownership position for private anti-competitive purposes. *See, e.g.,* S.Rep. No. 1584, 87th Cong., 2d Sess. 11 (1962), U.S. Code Cong. & Admin. News 1962, p. 2269. The focus of the "antitrust consistency clause" is evident from the listing of concerns in section 701(c) in the very sentence that concludes with the clause:

It is the intent of Congress that all authorized users shall have nondiscriminatory access to the system; that maximum competition be maintained in the provision of equipment and services utilized by the system; that the corporation created under this chapter be so organized and operated as to maintain and strengthen competition in the provision

of communications services to the public; and that the activities of the corporation created under this chapter and of the persons or companies participating in the ownership of the corporation shall be consistent with the Federal antitrust laws.

There is no hint in this catalogue of concerns that COMSAT's role as participant in INTELSAT must conform to antitrust limitations. Congress was so advised by the Department of Justice. *See Antitrust Problems of the Space Satellite Communication System: Hearings Before The Subcomm. on Antitrust and Monopoly of the Senate Comm. on the Judiciary,* 87th Cong., 2d Sess. 58 (1962) (testimony of Asst. Atty. Gen. Katzenbach) ("[T]he mere doing of what [COMSAT is] permitted to do under this bill is not itself going to result in an offense against the Sherman Act.").

■ We disagree with Judge Keenan only in his unstated premise that Alpha Lyracom's complaint alleges only activities by COMSAT in its capacity as United States representative to INTELSAT, as distinct from its capacity as a common carrier. Though the complaint is directed primarily to actions taken by COMSAT acting as a signatory to INTELSAT, lurking within it are allegations of anticompetitive conduct by COMSAT in its "separate role," as the corporation itself describes it, "as the sole provider of access to the global satellite system to U.S. communications carriers." Brief for Appellee at 38. We do not fault the District Judge for not undertaking a precise parsing of the complaint in an effort to winnow out the few allegations that arguably concern COMSAT's role as common carrier. That task should be undertaken by the appellants. But we are persuaded that the appellants must be accorded an opportunity to amend their complaint in light of the District Court's proper dismissal of it to the extent that it challenged COMSAT's actions as representative to INTELSAT.

In remanding to afford appellant the opportunity to recast its complaint, we caution against any effort to dress up "Signatory" allegations in the language of "common carrier" allegations. If Alpha Lyracom can allege specific aspects of COMSAT's conduct as common carrier that are actionable under the antitrust laws, it is free to proceed. But the effort will require precise drafting and an avoidance of the scattershot approach evident in the current complaint. In particular, we caution Alpha Lyracom not to assume, as it appears to do in some of its argument, that an allegation against COMSAT will survive dismissal as long as it is confined to unilateral rather than concerted action. The line to be drawn is not between concerted and unilateral action, since even COMSAT's unilateral action might have been undertaken in its role as signatory to INTELSAT, but between action taken as signatory and action taken as common carrier. If the amended complaint fails to isolate actionable conduct by COMSAT as common carrier, the District Court should not hesitate to dismiss it again.

We need not consider the District Court's alternate ground for dismissal of the antitrust claims—failure to join indispensable parties under Civil Rule 19, since any allegations that Alpha Lyracom is able to replead challenging COMSAT's conduct in its role as common carrier are unlikely to encounter the indispensable party concerns Judge Keenan noted with respect to the "signatory" allegations.

Similarly, we need not assess the adequacy of appellants' state law claims for tortious interference with business opportunities since all of these allegations concern COMSAT's consultative activity within INTELSAT relating to the authorization of a competing satellite system. Those are plainly "signatory" activities. Appellants may, if so advised, replead state law claims, confined to COMSAT's common carrier role, bearing in mind the strict pleading requirements of state law claims emphasized by the District Court. *See Optivision, Inc. v. Syracuse Shopping Center Associates,* 472 F.Supp. 665, 685 (N.D.N.Y.1979); *Susskind v. Ipco Hospital Supply Corp.,* 49 A.D.2d 915, 373 N.Y.S.2d 627, 629 (App.Div.2d Dep't 1975).

### Conclusion

Though we affirm the District Court's basic ruling that COMSAT's conduct as a signatory to INTELSAT is immune from antitrust challenge, we reverse and remand to afford appellants an opportunity to re-plead such allegations as they may have concerning COMSAT's role as common carrier.