**ALPHA LYRACOM SPACE COMMUNICATIONS, INC., Reynold V. Anselmo, Pan American Satellite, and Panamsat, L.P., Plaintiffs,**

v.

**COMSAT CORPORATION, Defendant.**

No. 89 Civ. 5021(JFK).

United States District Court,
S.D. New York.

Sept. 5, 1996.

Shulman, Gainsley, Shulman, Walcott & Davis, P.A., Minneapolis, MN (Daniel R. Shulman, of counsel), Law Firm of Joseph M. Alioto, San Francisco, CA (Joseph M. Alioto, of counsel), for Plaintiffs.

Howrey & Simon, Washington, DC (A. Duncan Whitaker, Mark D. Wegener, Basil C. Culyba, Lisa J. Saks, Kirsten A. Wolfe, of counsel), Davis, Scott, Weber & Edwards, New York City (Thomas J. Sweeney III, of counsel), COMSAT Corp., Washington, DC (Warren Y. Zeger, Keith H. Fagan, Howard D. Polsky, of counsel), for Defendant.

### OPINION and ORDER

KEENAN, District Judge.

There are four motions before the Court.[1] Plaintiffs have filed three motions objecting to various discovery decisions rendered by Magistrate Judge Nina Gershon. Defendant has filed a motion for summary judgment. For the reasons set forth below, Plaintiffs' discovery motions are denied and the orders of the Magistrate Judge are affirmed in all respects. Defendant's motion for summary judgment is granted as to all claims.

### Background

The background of this action has been fully presented in the earlier opinions of this Court and of the Second Circuit. *See Alpha Lyracom Space Communications, Inc. v. Communications Satellite Corp.*, 1990–2 Trade Cases (CCH) ¶ 69,188, 1990 WL 135637 (S.D.N.Y.1990) (dismissing 1st Am. Compl. on immunity grounds), *aff'd in part, rev'd & rem'd in part*, 946 F.2d 168 (2d Cir.1991) (remanded for opportunity to re-plead), *cert. denied*, 502 U.S. 1096, 112 S.Ct. 1174, 117 L.Ed.2d 419 (1992); *Alpha Lyracom Space Communications, Inc. v. Communications Satellite Corp.*, 1993–1 Trade

Cases (CCH) ¶ 70,184, 1993 WL 97313 (S.D.N.Y.1993) (denying motion to dismiss 2d Am. Compl.); *Alpha Lyracom Space Communications, Inc. v. Communications Satellite Corp.*, 1994–2 Trade Cases (CCH) ¶ 70,689, 1994 WL 256671 (S.D.N.Y.1994) (granting leave to file 3d Am. Compl. naming as a Plaintiff PANAMSAT, L.P.; denying leave to add new defendants and claims).

### I. Factual background

The Court assumes the reader's familiarity with the prior opinions in this action and provides below only a rudimentary recitation of the facts and procedural history.

#### A. Parties

Plaintiffs consist of various formations of Pan American Satellite ("PAS" or "PANAMSAT") and its founder and principal owner, Reynold V. Anselmo ("Anselmo"). Plaintiff Anselmo formerly did business as Alpha Lyracom, a sole proprietorship, which in turn did business as Pan American Satellite, Alpha Lyracom Space Communications, Inc., a Delaware corporation, and PANAMSAT, L.P., a Delaware limited partnership. PANAMSAT, L.P. succeeded Alpha Lyracom after the commencement of this action. The managing general partner of PANAMSAT, L.P. is PANAMSAT, Inc., which is a corporation that was controlled by Plaintiff Anselmo until his death on September 20, 1995. The executors of Plaintiff Anselmo's estate were substituted as Plaintiffs on January 3, 1996.

This action arises out of PAS's launching, marketing and operating the first international commercial communications satellite outside of the International Telecommunications Satellite Organization ("Intelsat"). Non-party Intelsat is an international organization created under a 1961 United Nations resolution that owns and operates a global satellite communications system. *See* G.A.Res. 1721, 1 U.N. GAOR Supp. (No. 17),

---

1. This is an edited version of the District Court's September 4, 1996 opinion. The portions of the September 4, 1996 opinion which were not contested on appeal have been excised from this edited version. This edited version contains only the District Court's rulings that Panamsat, L.P. could neither base its antitrust claims against

COMSAT Corporation on the Intelsat boycott resolution nor take discovery from Intelsat and COMSAT concerning the resolution. These were the only rulings from which Panamsat, L.P. appealed, and those rulings were affirmed by the Second Circuit on May 15, 1997.

at 6, U.N.Doc. A/5100 (1962). Intelsat is structured on three levels: the Assembly of Parties, the Meeting of Signatories, and the Board of Governors. Each member-nation or "party" has a seat and a vote in the Assembly of Parties. The United States has designated the State Department as its representative to the Assembly of Parties. Each party also designates a "signatory" to market and operate the Intelsat communications system within the party's territory. Each signatory is represented in the Meeting of Signatories and on the Board of Governors. Signatories range from public ministries to private corporations, depending on the level of regulation in a nation. Signatories are often referred to as "PTTs," an acronym for "post, telegraph, and telephone" companies. The Board of Governors consists of approximately twenty-nine persons representing all of the signatories in the day-to-day operations of the system. The Director General of Intelsat heads the Board of Governors. *See Alpha Lyracom*, 1990–2 Trade Cases (CCH) ¶ 69,188 at 64,580, 1990 WL 135637 at *2; *Alpha Lyracom Space Communications, Inc. v. Communications Satellite Corp.*, 946 F.2d 168, 170 (2d Cir.1991).

In 1962 Congress enacted the Communications Satellite Act ("CSA") to implement the United States' participation in Intelsat. *See* 47 U.S.C. §§ 701 *et seq.* Defendant Commercial Satellite Corporation ("Comsat") is a private corporation created under the CSA and designated as the United States' signatory to Intelsat. The CSA provides that Comsat "shall be ... subject to appropriate governmental regulation" and that "the ownership of the corporation [ (Comsat) ] shall be consistent with the federal antitrust laws." *See id.* § 701(c). Comsat is subject to extensive Executive Branch supervision by the State Department and the Federal Communications Commission ("FCC") to assure that Comsat's relations with foreign governments are consistent with the United States' foreign policy. *See id.* § 721(a)(4).

## B. Operation of Intelsat, immunity, & separate systems

Any Intelsat transmission requires the action of two PTT signatories, with each re-

sponsible for the transmission of a signal to and from a ground station in its territory and an Intelsat satellite. Rates for the use of Intelsat satellite capacity are uniform and, in the aggregate, cover the costs of operating the system. Rates are set by the Board of Governors, not the signatory PTTs such as Comsat. The procurement of satellite capacity is also regulated, with procurement in excess of $500,000 requiring approval of the Board. Signatories have no authority to approve procurement.

To join Intelsat, the United States implemented various international agreements including the 1971 Definitive Agreement (the formative document of Intelsat), and the 1976 Headquarters Agreement. *See Alpha Lyracom*, 1990–2 Trade Cases (CCH) ¶ 69,188 at 64,580, 1990 WL 135637 at *2 (Intelsat's headquarters are located in the United States.). These agreements require that each party-nation grant appropriate privileges, exemptions and immunities to Intelsat, to the other parties, the signatories and their representatives. The 1976 Headquarters Agreement provides "[t]he officers and employees of Intelsat, the representatives of the parties and of the signatories ... shall be immune from suit and legal process relating to acts performed by them in their official capacity...." *Alpha Lyracom*, 1990–2 Trade Cases (CCH) ¶ 69,188 at 64,580–81, 1990 WL 135637 at *3; *see Alpha Lyracom*, 946 F.2d at 170–72. This Court previously held, and the Second Circuit affirmed, that Comsat as a signatory is the representative of the United States for Intelsat immunity purposes. *See Alpha Lyracom*, 1990–2 Trade Cases (CCH) ¶ 69,188 at 64,584, 1990 WL 135637 at *6–7.

While Intelsat was created to establish a single global satellite system, the Definitive Agreement also provides for the creation of separate satellite systems. Article XIV of the Definitive Agreement sets out a "consultation process." *See Alpha Lyracom*, 1990–2 Trade Cases (CCH) ¶ 69,188 at 64,581–82, 1990 WL 135637 at *3–4. For domestic satellite services, the party seeking to provide a separate system must consult the Board of Governors regarding the technical compatibility of the proposed system with Intelsat.

For international services, the party must also consult the Assembly of Parties for approval. *See id.* Thus a separate international system requires the home government to clear the nascent service with the entire Assembly.

In addition to technical clearance from the Board and approval of the Assembly of Parties, a proposed separate international system must acquire "landing rights" in each nation to which it intends to deliver a signal. Landing rights are authorization from a party to provide or "land" a satellite signal within that party's national territory. Landing rights are generally procured from or with the assistance of the signatory PTT in each nation. Landing rights may issue either as general or limited grants of authority for the provision of independent services, or through some form of joint venture or other arrangement with the PTT. The scope of authorization is generally governed by the terms of a formal agreement, referred to in the record and herein as an "operating agreement." Depending upon the regulatory structure of a given nation at a given time, landing rights (and therefore operating agreements), may have been literally impossible to obtain.

## C. United States' separate systems policy

In 1983 the FCC received several applications to operate separate satellite systems, ultimately resulting in Presidential Determination No. 85–2. *See* 49 Fed.Reg. 46,987 (1984); *Alpha Lyracom,* 1990–2 Trade Cases (CCH) ¶ 69,188 at 64,581–82, 1990 WL 135637 at *3–4; *Alpha Lyracom,* 946 F.2d at 171–72. Determination No. 85–2 allowed the development of separate systems but directed the State Department to consult with Intelsat before authorizing any separate system to ensure that the United States met its obligations under the Definitive Agreement. The President also instructed the Secretaries of the State Department and the Commerce Department to set criteria for final FCC approval of any separate systems. Under these criteria, the FCC required (a) that each new system be restricted to providing services through the sale or long-term lease of transponders or space segment capacity for communications not interconnected with public switched message networks, and (b) that one or more foreign authorities authorize the use of each proposed separate system prior to FCC approval by granting the proposed system landing rights and by entering into Article XIV consultation procedures with the United States' party to insure technical compatibility of the proposed system with Intelsat satellites. Congress ratified these conditions in the Foreign Relations Authorization Act, Fiscal Years 1986–87 ("FRAA"). *See* Pub.L. No. 99–93, 99 Stat. 405, 425 (1985); *Alpha Lyracom,* 946 F.2d at 171–73.

While the first applications for approval of proposed separate satellite systems were still pending, the FCC issued a Report and Order dated July 25, 1985 stating that the FCC would not issue a final license for the operation of any separate system "until the U.S. has completed coordination of that system with Intelsat pursuant to Art. XIV(d)." *See* In re Establishment of Satellite Systems Providing International Communications, FCC Docket No. 84–1299, at 143 (July 25, 1985) ("FCC Report and Order"). In September 1985, the FCC preliminarily approved Plaintiffs' application to operate a subregional Western Hemisphere satellite system. In September 1987, Plaintiffs received final FCC approval to launch in June 1988 Plaintiffs' first satellite, the "PAS–1." *See Alpha Lyracom,* 1990–2 Trade Cases (CCH) ¶ 69,188 at 64,582, 1990 WL 135637 at *4.

## D. Response to the United States' separate systems policy

The other parties and signatories to Intelsat widely opposed Presidential Determination No. 85–2 and the United States' support of separate satellite systems. These participants in Intelsat were concerned that permitting competing systems would lead to the destruction of the Intelsat network, to the great disadvantage of regions less technologically developed than the United States. This concern was heightened by the fact that the United States was by far the largest participant in Intelsat, and that any action by the

United States greatly effected the global system. As a result, at the fourteenth session of the Meeting of Signatories, held in April 1984, the signatories discussed and unanimously ratified a resolution agreeing not to sponsor the development of separate systems. *See* PAS Ex. 3085 (record of the Fourteenth Meeting of Signatories of Intelsat). Comsat voted in favor of the resolution. Under the direction of the State Department, however, Comsat also presented to the Meeting of Signatories a statement on the United States' position in favor of separate systems. *See* PAS Ex. 3085, Attachment No. 2, at 29, Annex (iii) (statement by the signatory of the United States). At the fifteenth session of the Meeting of Signatories, held in April 1985, and the sixteenth session, held in April 1986, the signatories passed resolutions reaffirming their opposition to separate satellite systems as harmful to the Intelsat network. *See* PAS Ex. 3082 (record of the Fifteenth Meeting of Signatories of Intelsat (Apr. 16, 1985)); PAS Ex. 3084 (record of the Sixteenth Meeting of Signatories of Intelsat (Apr. 10, 1986)).

Plaintiffs' First Amended Complaint cites the 1984 Intelsat signatory resolution and the 1985 and 1986 reaffirming resolutions as admissions of a conspiracy involving Intelsat, Comsat and the PTTs. After the Second Circuit affirmed this Court's ruling on Comsat's signatory immunity, Plaintiffs' deleted from their Second and Third Amended Complaints any claims specifically based on the resolutions, referring to the resolutions only as "evidence" of a conspiracy between Comsat and the PTTs acting as common carriers outside of their roles as Intelsat signatories. *Compare* 1st Am. Compl. ¶¶ 28(c)-(d), *with* 2d Am. Compl. ¶ 28(b) (omitting references to the resolutions).[2]

## II. Procedural history

Plaintiffs' filed the original Complaint on July 25, 1989, and filed a First Amended Complaint on November 22, 1989. On September 13, 1990, the Court dismissed the First Amended Complaint on immunity grounds without reaching the merits of the underlying antitrust claims. *See Alpha Lyracom,* 1990–2 Trade Cases (CCH) ¶ 69,188, 1990 WL 135637 (S.D.N.Y.1990). The Court found that signatories were "representatives of the parties;" that the immunity clause of the Headquarters Agreement covering representatives therefore applied to signatories such as Comsat; and that the antitrust consistency clause of the CSA does not apply to Comsat's actions as a signatory. *See id.* at 64,582–83, 1990 WL 135637 at *6. In the alternative, the Court dismissed the First Amended Complaint pursuant to Fed. R.Civ.P. 19 for failure to join Intelsat, the Intelsat parties, and the Intelsat signatory PTTs as necessary and indispensable parties. *See id.* at 64,584–85, 1990 WL 135637 at *9–10. The Court also dismissed Plaintiffs' state law interference with prospective advantage claim for failure to specify the contracts that were lost. *See id.* at 64,585–86, 1990 WL 135637 at *10.

The Second Circuit affirmed this Court's rulings on Defendant's immunity and on the antitrust exclusion clause. *See Alpha Lyracom Space Communications, Inc. v. Communications Satellite Corp.,* 946 F.2d 168 (2d Cir.1991), *cert. denied,* 502 U.S. 1096, 112 S.Ct. 1174, 117 L.Ed.2d 419 (1992). The Circuit remanded only to give Plaintiffs an opportunity to replead their claims against Comsat in its role as a common carrier, and not as an immune signatory. *See Alpha Lyracom,* 946 F.2d at 175. The Circuit also warned Plaintiffs that if they presented only a formalistic repleading of the claims in the First Amended Complaint, the "District Court should not hesitate to dismiss [Plaintiffs' complaint] again." *Id.*

If [Plaintiffs] can allege specific aspects of COMSAT's conduct as common carrier that are actionable under the antitrust laws, [they are] free to proceed. But the effort will require precise drafting and an avoidance of the scattershot approach evident in the current complaint. In particular, we caution [plaintiffs] not to assume, as [they appear] to do in some of [their]

---

**2.** Plaintiffs' Third Amended Complaint adds PANAMSAT, L.P. as a party and is otherwise identical.

argument, that an allegation against COMSAT will survive dismissal as long as it is confined to unilateral rather than concerted action. The line to be drawn is not between concerted and unilateral action, since even COMSAT's unilateral action might have been undertaken in its role as signatory to INTELSAT, but between action taken as signatory and action taken as common carrier.

*Id.* Regarding the PTTs as necessary parties, the Circuit stated:

We need not consider the District Court's alternative ground for dismissal of the antitrust claims—failure to join indispensable parties under Civil Rule 19, *since any allegations that Alpha Lyracom is able to replead challenging COMSAT's conduct in its role as common carrier are unlikely to encounter the indispensable party concerns Judge Keenan noted with respect to the "signatory" allegations.*

*Id.* Concerning the state law claims, the Circuit stated:

Similarly, we need not assess the adequacy of appellant's state law claims for tortious interference with business opportunities since all of these allegations concern COMSAT's consultative activity within INTELSAT relating to the authorization of a competing satellite system. Those are plainly "signatory activities." Appellants may, if so advised, replead state law claims, confined to COMSAT's common carrier role, bearing in mind the strict pleading requirements of state law claims emphasized by the District Court.

*Id.*

Plaintiffs' filed their Second Amended Complaint on November 12, 1991. The Second Amended Complaint restated the conspiracy, antitrust and state law claims of the First Amended Complaint, but omitted references to the PTTs as "other Intelsat signatories" and inserted repeated assertions that "[a]ll of this conduct has been undertaken by Comsat outside of its capacity as United States signatory to Intelsat." 2d Am. Compl. ¶ 27.

On March 30, 1993, the Court denied Comsat's motion to dismiss the Second Amended Complaint. The Court rejected Comsat's challenge to subject matter jurisdiction and denied the applicability of the act of state doctrine. *See Alpha Lyracom Space Communications, Inc. v. Communications Satellite Corp.,* 1993–1 Trade Cases (CCH) ¶ 70,-184, 1993 WL 97313 (S.D.N.Y.1993).

With regard to Plaintiffs' conspiracy and antitrust claims, the Court deferred to the liberal pleading requirements of Fed.R.Civ.P. 8(a) and accepted Plaintiffs' representations that the restated claims in the Second Amended Complaint did not implicate Defendant's role as a signatory. *See id.* at 69,861–62, 1993 WL 97313 at *5–6. The Court did not endorse Plaintiffs' claims, as Plaintiffs' argue in support of their current motions, but merely noted that "[a]ny further distinguishing between Comsat's roles as common carrier and an Intelsat signatory at this time would inappropriately transform this motion to dismiss into a motion for summary judgment." *Id.* at 69,861, 1993 WL 97313 at *4.

The Court denied Defendant's argument that the *Noerr–Pennington* doctrine barred Plaintiffs' claim that Comsat interfered with PAS's obtaining landing rights and operating agreements in several nations, finding that the question of the availability of landing rights and operating agreements went beyond the scope of the pleadings. *Id.* at 69,863, 1993 WL 97313 at *8. The Court also denied Defendant's argument that the *Noerr–Pennington* doctrine—which states that concerted efforts to restrain trade by petitioning government officials are protected from antitrust liability—barred Plaintiffs' claim that Comsat interfered with Plaintiff Anselmo's application to the FCC for a tax deferral certificate. *See id.*

Finally, the Court denied Defendant's motion to dismiss Plaintiff's claim for injunctive relief under Fed.R.Civ.P. 12(b)(7), and accepted as pleaded Plaintiffs' claims for interference with prospective advantage under New York and Connecticut law. *See id.* at 69,863–64, 1993 WL 97313 at *8.

Plaintiffs moved to file a Third Amended Complaint adding as a plaintiff PANAMSAT, L.P., a Delaware limited partnership formed after the commencement of this action, adding as defendants seventeen PTTs (including

fifteen Intelsat signatories and two PTT parent companies), and adding new claims allegedly based on acts committed after the filing of the Second Amended Complaint. On June 7, 1994, the Court granted without objection leave to file a Third Amended Complaint adding PANAMSAT, L.P., but denied leave to add any new claims or defendants. *See Alpha Lyracom Space Communications, Inc. v. Communications Satellite Corp.,* 1994–2 Trade Cases (CCH) ¶ 70,689, 1994 WL 256671 (S.D.N.Y.1994). The Court found that adding new defendants and claims after significant discovery had been completed would result in prejudice and delay. *See id.* at 72,729–30, 1994 WL 256671 at *2. The Court also found that joinder of the foreign PTTs would be improper under the law of the case. *See id.* at 72,730, 1994 WL 256671 at *3.

The parties have concluded extensive discovery. They have taken depositions of more than thirty-five current and former Comsat employees and five third-party witnesses, and have produced well over 330,000 pages of documents among themselves and at least an additional 57,000 pages from nineteen third-parties. *See Alpha Lyracom,* 1994–2 Trade Cases (CCH) ¶ 70,689, 1994 WL 256671 at *1; Def.'s S.J. Mem. at 2. The only outstanding discovery issues are presented by Plaintiffs' current motions objecting to various orders of the Magistrate Judge, principally concerning the discoverability of the Intelsat signatory resolutions of 1984, 1985, and 1986. The Court addresses those motions below, prior to its discussion of Defendant's motion for summary judgment.

## Discussion

### I. Plaintiffs' discovery motions

Plaintiffs' object to various discovery orders of Magistrate Judge Nina Gershon. For the reasons discussed below, the Court overrules the objections and affirms the Magistrate Judge's orders.

### A. The July 20, 1994 order

[excised from this edited version]

### B. The July 12, 1994 order

Richard Colino was employed at Comsat from 1973 to 1979, served as a consultant to Comsat from 1979 to 1981, and was Director General of Intelsat from 1983 to 1986. Plaintiffs' object to that portion of Magistrate Judge Gershon's July 12, 1994 order which granted Defendant Comsat and non-party Intelsat's motions for an order under Fed. R.Civ.P. 26(c)(1) and 45(c)(3) quashing the deposition subpoena served by Plaintiffs on Richard Colino, and for a protective order precluding Plaintiffs from taking Colino's deposition with regard (a) to any information obtained by Colino as a result of his role as Director General of Intelsat (including information about the Intelsat signatory resolutions) and (b) to Colino's service at Comsat insofar as Comsat was a signatory to Intelsat (Magistrate Judge Gershon permitted inquiry of Colino regarding Comsat's non-immune, common-carrier role.). *See* App. to Pls.' Objs. to M.J. Gershon's Order Regarding the Dep. of Richard Colino, Ex. A (Order of July 12, 1994) (hereinafter "Colino Order").

■ Again, pursuant to 28 U.S.C. § 636(b)(1)(A), Plaintiffs' objections are subject to a "clearly erroneous" standard. Plaintiffs argue that two of the rulings in the Magistrate Judge's July 12, 1994 order are clearly erroneous. Plaintiffs argue that the Magistrate Judge erred in finding that Intelsat has not waived its immunity with respect to Colino. Plaintiffs also argue that the Magistrate Judge erred in finding that Plaintiffs may not inquire of Colino concerning the Intelsat signatory resolutions or the acts of Intelsat, Comsat, and the Intelsat signatory PTTs to implement those resolutions.

### 1. Intelsat's immunity

[excised from this edited version]

### 2. Plaintiffs' boycott claims

■ Plaintiffs also challenge as clearly erroneous the Magistrate Judge's finding that Plaintiffs may not inquire of Colino concerning either the Intelsat signatory resolutions or the acts of Intelsat, Comsat, or the signatory PTTs to implement those resolutions. Plaintiffs argue that the resolutions and their implementation are not privileged because

they are not proper signatory functions. Plaintiffs further argue that even if the passage and implementation of the resolutions were proper signatory functions, they should be discoverable for the purpose of establishing a record for appeal and the motive behind Comsat's acts as a common-carrier.

The signatory resolutions are official Intelsat documents resulting from official sessions of the Meeting of Signatories. Comsat participates in those sessions as the signatory of the United States, not as a common-carrier. Although Plaintiffs' argue that the resolutions "could ... have been agreed to anywhere," Reply Mem. of Pls.' in Supp. of Objs. to Mag.'s Order Regarding Dep. of Richard Colino at 25 (hereinafter "Pls.' Colino Reply Mem."), the fact remains that the resolutions resulted from official sessions of Intelsat signatories. It is not the function of this Court to inject itself into those sessions to determine whether Comsat is properly fulfilling its obligations as the United States' Signatory. Congress assigned that function to the Executive, as even Plaintiffs acknowledge in their papers. See Pls.' Colino Reply Mem. at 21 (discussing a memorandum of understanding reached by Comsat, the FCC, the State Department, and the Department of Commerce after the 1984 Intelsat signatory resolution); see also Alpha Lyracom, 946 F.2d at 171 (discussing Executive Branch authority "to oversee and regulate COMSAT's management and operation of the system and its relations with foreign governments and their designated satellite management entities"). The Court's function is to uphold Congress's grant to signatory immunity to Comsat, as it has been explained in the prior orders of this Court and the Second Circuit. See Alpha Lyracom, 1990–2 Trade Cases (CCH) ¶ 69,-188 at 64,584, 1990 WL 135637 at *6–7; Alpha Lyracom, 946 F.2d at 174–75. Accordingly, discovery concerning the signatory resolutions and their implementation was properly barred.

Plaintiffs' argument that it should be permitted discovery concerning the resolutions in order to create a "factual record" for appeal is a mere attempt to subvert the Second Circuit's affirmance of this Court's findings on Comsat's immunity. Plaintiffs

had the opportunity to appeal this issue, exhausted that opportunity, and now must conduct their discovery within the parameters set by the Second Circuit.

Plaintiffs' analogizing Comsat's signatory immunity to a duck blind or sanctuary "in which to plot illegal conduct" misses the mark. Congress exempted the Intelsat Signatories from suit and legal process in antitrust actions, not from criminal prosecution. In this antitrust action, therefore, the Court will not permit inquiry into Comsat's actions during signatory meetings or while it otherwise acted as a signatory. If, as per Plaintiffs' analogy, this were a criminal action charging Defendant with arson or conspiracy to commit murder, the scope of permissible inquiry obviously would differ.

■ Plaintiffs' argument that the resolutions and their implementation are discoverable to show intent or motive also fails to persuade the Court. Plaintiffs analogize to the Noerr–Pennington doctrine and the admissibility of evidence of acts which are themselves immune from antitrust liability. See Pls.' Colino Mem. at 17 (citing United States Football League v. NFL, 842 F.2d 1335, 1374 (2d Cir.1988); Alexander v. National Farmers Org., 687 F.2d 1173, 1196 (8th Cir.1982), cert. denied, 461 U.S. 937, 103 S.Ct. 2108, 77 L.Ed.2d 313 (1983); Feminist Women's Health Center, Inc. v. Mohammad, 586 F.2d 530, 543 n. 7 (5th Cir.1978), cert. denied, 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979)). But the Magistrate Judge correctly found that the immunity from suit and legal process enjoyed by Intelsat signatories is much broader that the exemption from antitrust liability at issue in the cases Plaintiffs cite. See Colino Order at 7–8. Those cases speak exemption or immunity from antitrust liability. They do not address the exemption from suit and legal process enjoyed by Intelsat signatories.

In sum, the Court finds that Comsat's signatory immunity has not been waived and therefore precludes Plaintiffs from using Comsat's conduct as an Intelsat signatory to prove a conspiracy or boycott by Comsat as a common carrier. The Court overrules Plaintiffs' objections and affirms the Magistrate Judge's July 12, 1994 order in all respects.

### 3. Defendant's application for sanctions

[excised from this edited version]

### C. The September 27, 1994 order

Plaintiffs also object to those portions of the Magistrate Judge's September 27, 1994 order denying two of Plaintiffs' motions to compel answers to Plaintiffs' discovery requests and granting Defendant's motion for a protective order.

### 1. Plaintiffs' motion to compel responses

 Plaintiffs' first motion to compel sought answers to Plaintiffs' Request for Admission No. 12 and Plaintiffs' Interrogatory No. 42. Plaintiffs' Request for Admission No. 12 and Defendant's response were as follows:

*REQUEST NO. 12:*

The statements contained in paragraph 28(d) of the complaint that you instigated, voted for, participated in, and caused to be adopted a resolution by Intelsat signatories "to refrain from entering into any arrangements which may lead to the establishment and subsequent use of" competing alternative satellite systems "to carry traffic to or from their respective countries," and on at least two occasions joined with Intelsat to ratify and reaffirm that resolution are true.

*RESPONSE*

COMSAT objects to this request because it calls for information relating to COMSAT's role as the United States signatory to INTELSAT which is outside the permissible scope of this lawsuit.

App. to Objs. of Pls.' to Disc. Orders of M.J. Gershon of Sept. 27, 1994, Ex. C at 9 (Comsat's Resps. to Pls.' 1st & 2d Sets of Reqs. for Admiss.). Plaintiffs' Interrogatory No. 42 and Defendant's response are as follows:

*INTERROGATORY NO. 42:* From 1984 to the present, have you had any understanding or agreement, express or implied, with any entity to refrain from entering into any arrangement which may lead to the establishment or subsequent use of a separate international satellite system to carry traffic to or from any country originating from or terminating in the United States?

*RESPONSE:* In addition to the General Objections set forth above, COMSAT objects to this interrogatory to the extent it calls for information pertaining to COMSAT's role as the United States signatory to Intelsat. COMSAT further objects to this interrogatory on the grounds that it is vague and unintelligible. Subject to these objections, COMSAT's answer is no.

*Id.,* Ex. C at 6 (Comsat's Resps. to Pls.' 5th Set of Interrogs. & Reqs. for Production of Docs.). For the reasons set forth above in the Court's discussion of Plaintiffs' boycott claims, the Court finds Defendant's responses appropriate. The Court agrees that Plaintiffs' Request for Admission No. 12 rests on the Intelsat signatory resolutions and the signatory boycott claims. The Court dismissed those claims from the First Amended Complaint on the grounds that they were barred by Defendant's Intelsat signatory immunity. Plaintiffs subsequently represented they had dropped those claims from the current complaint. The Court also agrees that Plaintiffs' sole basis for challenging Comsat's response to Interrogatory No. 42 was Comsat's proper refusal to disclose information about the Intelsat signatory resolutions. The Court therefore overrules Plaintiffs' objections and affirms the Magistrate Judge's order as to the motion to compel responses.

### 2. Plaintiffs' motion to compel production

 Plaintiffs' second motion sought to compel production of documents responsive to subparagraph 24 of Plaintiffs' Document Request No. 76. The request and Defendant's response were as follows:

*DOCUMENT REQUEST NO. 76:* In relation to each meeting identified below, produce all documents referring thereto, and all documents used in conjunction with, or arising from, any such meeting:

Meetings between representatives from Comsat and representatives from each of the foreign PTTs set forth in Paragraph K of this Document Request, "to urge all

Signatories to refrain from entering into any' arrangements which may lead to the establishment and subsequent use" of other satellite systems "to carry traffic to or from their respective countries" following the April 1984 meeting of signatories memorialized in the "Intelsat Meeting of Signatories Record of Decisions of the Fourteenth Meeting" at pp. 11–12. (Ex. 31, hereto).

*RESPONSE:*

COMSAT incorporates its General Objections and files the following specific objections to Document Request No. 76.... COMSAT objects to Request No. 76 to the extent it calls for documents relating to subjects deleted from the original complaint and not found in the Second Amended Complaint.... COMSAT objects to Request No. 76 to the extent it calls for information relating to COMSAT's role as the U.S. Signatory to INTELSAT (particularly subparagraph 24).

*Id.*, Ex. C at 6, 11 (Comsat's Resps. to Pls.' 6th Set of Interrogs. & Reqs. for Production of Docs.). The Court agrees that Plaintiffs' sole basis for challenging Comsat's response to this request was Comsat's proper refusal to disclose information about the Intelsat signatory resolutions. For the reasons stated above, the Court overrules Plaintiffs' objections and affirms the order of the Magistrate Judge as to the motion to compel production.

**3. Defendant's notion for a protective order**

■ Plaintiffs also object to Magistrate Judge Gershon's granting Defendant's motion for a protective order precluding Plaintiffs from taking a Rule 30(b)(6) deposition that was directed solely at Intelsat and signatory conduct, particularly the Intelsat signatory resolutions and their implementation. For the reasons stated above, the Court overrules Plaintiffs' objections and affirms the order of the Magistrate Judge as to the granting of Defendant's motion for a protective order.

**4. Defendant's application for sanctions**

[excised from this edited version]

**II. Defendant's motion for summary judgment**

Defendant moves for summary judgment on all of the claims in Plaintiffs' Third Amended Complaint. The Court heard argument from the parties on the motion on August 3, 1995.

**A. Overview**

The central allegation in Plaintiffs' Third Amended Complaint is that Defendant Comsat entered into a conspiracy to prevent PAS's entry into the commercial communications satellite market and generally to prevent the development of satellite systems separate and apart from Intelsat. *See* 3d Am. Compl. ¶ 27. Plaintiffs allege that Comsat was joined in the conspiracy by the PTTs in Chile, Argentina, Brazil, Venezuela, Colombia, Guatemala, Jamaica, Barbados, Trinidad & Tobago, the Dominican Republic, the United Kingdom, France, Germany, Italy, and Spain, all of which were also the Intelsat signatory for their respective nation, with the possible exception of the PTT in Guatemala. *See* 3d Am. Compl. ¶ 26; Pls.' 3(g) Statement ¶ 14 at 8. Plaintiffs claim that in furtherance of the conspiracy the PTTs refused to provide PAS with landing rights and operating agreements in their respective countries. Plaintiffs claim that Comsat furthered this conspiracy by refusing to purchase capacity from PAS, creating services and joint ventures which would directly compete with PAS, and disparaging PAS to prospective customers. *See* 3d Am. Compl. ¶ 28.

Plaintiffs frame eleven claims from their core allegation of a conspiracy against PAS and from the conduct alleged in support of that conspiracy. Plaintiffs raise two claims under § 1 of the Sherman Act, consisting of one claim of conspiracy to boycott and to refuse to deal with PAS, and one claim of conspiring to restrain trade and commerce in the relevant market and the geographic submarkets. *See* 3d Am. Compl. ¶ 33. Plaintiffs raise seven claims under § 2 of the Sherman Act, consisting of one claim of monopolization

involving the United States market, three claims of attempted monopolization respectively involving the United States market, domestic and regional markets in Central and South America, and domestic and regional markets in Europe, and three claims of conspiracy to monopolize, again respectively involving the United States market, domestic and regional markets in Central and South America, and domestic and regional markets in Europe. *See* 3d Am. Compl. ¶ 32. Plaintiffs also raise two claims of interference with prospective advantage respectively under the common law of New York and Connecticut. *See* 3d Am. Compl. ¶ 34.

In opposition to the current motion, Plaintiffs argue that summary judgment is inappropriate because Defendant's intent is a material issue in dispute with regard to much of the evidence and several of the claims. *See* Pls.' Mem. in Opp'n to Def.'s Mot. for Summ. J. (hereinafter "Pls.' Opp'n Mem.") at 28 (claim for refusal to use PAS capacity), 31 (Latin American joint venture claims), & 32 (Atlantic Television claim). The Court disagrees.

> [B]oth the Supreme Court and the Court of Appeals for the Second Circuit have held, in antitrust cases involving allegations of conscious parallelism and concerted refusals to deal, that summary judgment may be granted in such cases if the moving party is able to show that the facts relied on by the plaintiff in support of its allegations are not susceptible of the interpretation the plaintiff seeks to give them and the plaintiff fails to respond to such a showing with 'significant probative evidence' in support of its theory of the case.

*Harlem River Consumers Coop. v. Associated Grocers of Harlem,* 1976 Trade Cas. (CCH) ¶ 60,820 at 68,575, 1976 WL 1238 at *4 (S.D.N.Y. Mar.5, 1976); *see also Modern Home Institute, Inc. v. Hartford Accident & Indemnity Co.,* 513 F.2d 102, 110 (2d Cir. 1975) ("Under these circumstances, unless plaintiffs have thus far turned up evidence from the defendants or elsewhere supporting their conspiracy theory we do not see how, in

the face of defendants' uncontradicted evidence negating it, trial would give them any greater opportunity to elicit from defendants and their employees evidence tending to prove it.").

Defendant's principal argument on the current motion is that Plaintiffs have failed to provide any evidence from which a reasonable jury could infer either the existence of the alleged conspiracy to boycott or to refuse to deal with PAS, or Comsat's membership in any such boycott or conspiracy. Comsat also argues that to the extent that Plaintiffs may have shown evidence of Comsat's opposition to separate satellite systems, such opposition is either immune conduct undertaken in Comsat's signatory role, or permissible competitive conduct undertaken in Comsat's common carrier role.

Comsat's secondary arguments are that Plaintiffs have failed to show that Comsat proximately caused any antitrust or other injury to PAS; that Plaintiffs have failed to provide a reasonable estimate of their alleged damages; and that Plaintiffs have failed to apportion their damage demand among the various claims alleged. Comsat also argues that Plaintiffs' failure to apportion damages is an admission that the many acts alleged in the Third Amended Complaint constitute a single boycott claim and do not allege independent antitrust violations. Comsat cites Plaintiffs' papers in opposition, wherein Plaintiffs admit that all of the acts alleged

> including [Comsat's] Latin American ventures, Atlantic Television ("ATV"), COMSAT's refusal to accept PAS offers of satellite capacity, COMSAT's filing against PAS's tax deferral, and COMSAT's representations to customers that PAS would be unable to obtain landing rights .... were in furtherance of the overall conspiracy with the PTTs to boycott separate systems.

Pls.' Opp'n Mem. at 3.[3]

■ At oral argument Plaintiffs disavowed any reading of their papers which would limit

---

**3.** *See also* Pls.' Opp'n Mem. at 7 ("As will be shown, all of this other conduct, from the joint ventures to ATV to the tax certificate to the disparagement to the refusal to take capacity on

PAS–1, was *directly and inextricably connected* with the separate systems boycott, and furthered that conspiracy. Accordingly, *the separate acts cannot be compartmentalized,* but must be viewed

the Complaint to the boycott claim. *See Alpha Lyracom Space Communications, Inc., et al. v. Comsat Corp.*, 89 Civ. 5021(JFK), Hr'g Tr. at 17–18 (Aug. 3, 1995). Plaintiffs argued that although each act alleged in the Third Amended Complaint supports the alleged conspiracy to boycott or to refuse to deal with PAS, many of those acts are also pleaded as independent antitrust violations. *See id.* (referencing Pls.' Opp'n Mem. at 23 (arguing that Defendant's alleged refusal to deal with PAS constitutes a separate act of monopolization in violation of § 2), 28 (arguing that Defendant's Latin American joint ventures constitute separate acts of monopolization in violation of § 2 "if undertaken for an exclusionary purpose")). Reading the Third Amended Complaint favorably to Plaintiffs, the Court must examine the evidentiary support for each alleged act both as an act in furtherance of the alleged conspiracy and as an independent antitrust violation.

Finally, Comsat argues that the Court should dismiss Plaintiffs' claims under the act of state doctrine or for failure to join as indispensable parties the alleged conspirator PTTs. The Court addresses these arguments after examining the alleged conspiracy and Plaintiffs' claims for damages.

### B. Standard

Fed.R.Civ.P. 56 "mandates the entry of summary judgment after adequate time for discovery and upon motion," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986), if the entire record demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The burden of showing that no genuine issue of material fact exists rests on the movant. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The burden will be satisfied if the movant can point to an absence of evidence to support an essential element of the nonmoving party's

claim. *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995). If the movant satisfies its burden, the nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2510 (requiring non-movant responding to a properly supported motion for summary judgment to adduce "significant probative supporting evidence" demonstrating that a factual dispute exists); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (requiring non-movant to present sufficient evidence to allow "a rational trier of fact to find for the non-moving party").

In viewing the evidence to determine whether there exists a genuine issue for trial, the Court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." *Delaware & Hudson Railway Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 177 (2d Cir.1990), *cert. denied*, 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991); *see Adickes*, 398 U.S. at 157, 90 S.Ct. at 1608. The Court may not resolve issues of fact, it may only ascertain whether such issues are present. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir.1987). In antitrust litigation, however, the non-moving party must set forth facts that tend to preclude an inference of permissible conduct. *See Capital Imaging v. Mohawk Valley Medical Assoc.*, 996 F.2d 537, 542 (2d Cir.), *cert. denied*, 510 U.S. 947, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993) (citing *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356).

Although difficult in factually complex cases, *see Hayden Publishing Co. v. Cox Broadcasting Corp.*, 730 F.2d 64, 68 (2d Cir.1984), summary judgment is not disfavored in antitrust actions. On the contrary, recognizing that summary judgment is not a substitute for trial, current Supreme Court and Second Circuit cases have "tended to

in the context of the evidence as a whole.") (emphasis added); *id.* at 47 ("[B]ecause the underlying boycott was the cause of PAS's injury, and the other acts were incidental to and in

furtherance of the boycott, PAS has not attempted to attribute damages to each of those subsidiary actions.").

encourage its use in complex cases such as this one." *Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987) (citing *Celotex Corp.,* 477 U.S. at 327, 106 S.Ct. at 2555; *Anderson,* 477 U.S. at 242, 106 S.Ct. at 2505; *Matsushita,* 475 U.S. at 574, 106 S.Ct. at 1356; *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 250–51 (2d Cir. 1985)); *see also Capital Imaging,* 996 F.2d at 541 ("[S]ummary judgment remains a vital procedural tool ... and may be particularly important in antitrust litigation."). If no material fact is presented after years of discovery including dozens of depositions and the production of thousands of documents, and the "most that can be hoped for is the discrediting of [the] defendants' denials at trial," a court must grant summary judgment. *Modern Home,* 513 F.2d at 110; *Perma Research & Development Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir.1969) ("Summary judgment cannot be defeated by the vague hope that something may turn up at trial.").

## III. Sherman Act § 1 conspiracies

▉▉▉▉ Section 1 of the Sherman Act prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." *See* 15 U.S.C. § 1. On a motion for summary judgment against a § 1 claim a court initially must determine whether a reasonable jury could find that there was some form of concerted action between two or more legally distinct entities. "Only after an illegal agreement is shown will a court consider whether the agreement constituted an unreasonable restraint of trade, whether *per se* or under the rule of reason." *AD/SAT v. Associated Press, et al.,* 920 F.Supp. 1287, 1308 (S.D.N.Y.1996) (Leisure, J.) (citing *Capital Imaging,* 996 F.2d at 542). In making this threshold determination, the Court must bear in mind that the "range of inferences" that a trier of fact may draw from ambiguous evidence in a § 1 case is limited, and the non-movant must "set forth facts that tend to preclude an inference of

permissible conduct." *Capital Imaging,* 996 F.2d at 542.

But antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. Thus, in *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. *Id.* at 764, 104 S.Ct. at 1470. *See also [First Nat. Bank of Ariz. v.] Cities Service, supra,* 391 U.S. [253] at 280, 88 S.Ct. [1575] at 1588[, 20 L.Ed.2d 569 (1968)]. To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. 465 U.S. at 764, 104 S.Ct. at 1471. Respondents in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents. *See Cities Service, supra,* 391 U.S. at 280, 88 S.Ct. at 1588. *Matsushita,* 475 U.S. at 587, 106 S.Ct at 1356–57; *see Apex Oil Co.,* 822 F.2d at 252; *Minpeco, S.A. v. Conticommodity Services, Inc.,* 673 F.Supp. 684, 688 (S.D.N.Y.1987). Plaintiffs, therefore, must present evidence which reasonably tends to prove that Comsat "'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984) (quoting *Edward J. Sweeney & Sons v. Texaco, Inc.,* 637 F.2d 105, 111 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)); *Minpeco,* 673 F.Supp. at 688; *Harlem River,* 1976 Trade Cas. (CCH) ¶ 60,820 at 68,575, 1976 WL 1238 at *4; *see also Michelman v. Clark–Schwebel Fiber Glass Corp.,* 534 F.2d 1036, 1043 (2d Cir.1976) (requiring a showing sufficient to warrant a jury in finding that the conspirators had a "'unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement'") (quoting *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct.

1125, 1139, 90 L.Ed. 1575 (1946)), *cert. denied,* 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1979).

 According to Plaintiffs, the common scheme to which Comsat consciously agreed was a conspiracy to boycott and to refuse to deal with PAS. *See* 3d Am. Compl. ¶ 33. If true, the conspiracy constitutes a *per se* violation of the Sherman Act. "[S]ome group boycotts involving concerted refusals to deal with a competitor" are *per se* violations. *See Capital Imaging,* 996 F.2d at 543 (citing *Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 211–12, 79 S.Ct. 705, 708–09, 3 L.Ed.2d 741 (1959)). Plaintiffs, therefore, need only to show the existence of the alleged conspiracy and Defendant's participation in it. *See Capital Imaging,* 996 F.2d at 542; *International Distrib. Centers, Inc. v. Walsh Trucking Co.,* 812 F.2d 786, 793 (2d Cir.), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987).

 Plaintiffs also claim that Defendant violated § 1 by conspiring to restrain unreasonably trade and commerce in the relevant markets. *See* 3d Am. Compl. ¶ 33. Like most § 1 claims, this claim must be analyzed under the rule of reason. The rule of reason requires the fact finder "to weigh all the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). Plaintiffs must still show Defendant Comsat's participation in an illegal contract, combination or conspiracy. Plaintiffs must then prove an antitrust injury by showing that the illegal agreement caused an actual adverse effect on competition as a whole in a relevant market. Proof that Plaintiffs have been harmed as an individual market actor is not enough. *See Capital Imaging,* 996 F.2d at 542–43; *International Distrib.,* 812 F.2d at 793 (citing *Brunswick Corp. v. Pueblo Bowl–O–Mat,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)). If Plaintiffs satisfy this threshold burden, Defendant Comsat must offer evidence of the pro-competitive virtues of the challenged combination. If Comsat presents such evidence, Plaintiffs

must show that any legitimate objectives could have been achieved by less restrictive alternatives. *See Capital Imaging,* 996 F.2d at 543. In other words, Plaintiffs must show that the "anticompetitive effects of the alleged conspiracy outweigh its procompetitive effects." *International Distrib.,* 812 F.2d at 793 (citing *National Soc'y of Prof. Eng'rs v. United States,* 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978)).

### A. Comsat's conscious participation in a common scheme

Plaintiffs argue that the existence of the alleged conspiracy and Comsat's conscious participation therein may be inferred from the record in three ways. Plaintiffs principally argue that the conspiracy and Comsat's participation may be inferred from an alleged pattern of refusals by the alleged PTT conspirators to grant PAS landing rights and operating agreements, coupled with additional considerations or "plus factors." Plaintiffs next argue that the conspiracy and Comsat's participation may be inferred from Comsat's alleged refusal to purchase space segment capacity from PAS. Plaintiffs then argue that the conspiracy and Comsat's participation may be inferred from Comsat's alleged "pattern and practice" of "tracking PAS throughout the world" and forming ventures in Europe and Latin America, allegedly for the exclusive purpose of preventing PAS's entry into those markets.

#### 1. Parallel refusals and plus factors

[excised from this edited version]

##### (A) No reasonable inference of parallel refusals

[excised from this edited version]

##### (B) Insufficient evidence of plus factors

Rather than present evidence of the alleged refusals to deal or delays, Plaintiffs urge the Court to examine additional factors which allegedly establish that the still unsubstantiated parallel conduct resulted from the alleged conspiracy. *See* Pls.' S.J. Opp'n Mem. at 11. These factors include a common intent to conspire, a high level of interfirm communications, "customary indications" of a traditional conspiracy, and evidence that the

alleged parallel conduct was contrary to the alleged conspirators' economic interests.

### (1) Intent to conspire

[excised from this edited version]

### (2) Interfirm communications

[excised from this edited version]

### (3) *Customary indications of conspiracy*

Plaintiffs also allege that support for the alleged conspiracy can be inferred from "customary indications" of traditional conspiracy. These indications allegedly include innumerable meetings between Comsat and the alleged co-conspirators involving specific attempts to block PAS, Defendant's dealings with Codetel in the Dominican Republic, and the Intelsat signatory resolutions regarding separate satellite systems.

### (a) Innumerable meetings

[excised from this edited version]

### (b) PAS, Codetel and Tricom

[excised from this edited version]

### (c) Intelsat resolutions

■ Plaintiffs also cite as "customary indication[s] of traditional conspiracy" the Intelsat separate systems resolutions. *See* Pls.' Opp'n Mem. at 15–18.[4] Plaintiffs claim to offer the resolutions as evidence of an intent to boycott PAS. *See* Pls.' Opp'n Mem. at 18–19. The Court rejected this argument in its earlier opinion, *see Alpha Lyracom,* 1993–1 Trade Cases (CCH) ¶ 70,184 at 69,860–61, 1993 WL 97313 at *3–4, and above in its discussion of the decisions of Magistrate Judge Gershon. *See supra* at 888–892. The Court declines to reexamine Plaintiffs argu-

---

4. Citing **PAS Ex. 3085** (record of the Fourteenth Meeting of Signatories of Intelsat concerning separate satellite systems, January 4, 1985); **PAS Ex. 3082** (record of the decisions of the Fifteenth Meeting of Intelsat Signatories concerning separate satellite systems, April 16, 1985); **PAS Ex. 3084** (report by the Sixteenth Meeting of Signatories to the Assembly of Parties, April 10, 1986); **PAS Ex. 3120** at 121 (testimony of Irving Goldstein, president of Comsat, before the Committee on Energy and Commerce of the House of Representatives, June 13, July 25 and 26, 1984, stating that the Intelsat signatory resolutions indicated frustration on the part of Comsat's treaty partners, and did not signal a decision to form a boycott).

ment here and finds that no inference may be drawn from the Intelsat resolutions.

The Court finds, therefore, that the record does not provide sufficient "customary indications" of traditional conspiracy to sustain an inference of a conspiracy or other anticompetitive conduct among Comsat and the PTTs.

### (4) Contrary to self-interest

[excised from this edited version]

### (C) No inference of Comsat participation

[excised from this edited version]

### 2. Refusal to purchase PAS capacity

[excised from this edited version]

### 3. Tracking PAS throughout the world

[excised from this edited version]

### B. Overt acts

Even if Plaintiffs had provided sufficient evidence of the alleged conspiracy and Comsat's participation therein, Plaintiffs have failed to provide sufficient evidence of any of the four acts alleged in the Complaint,[5] either as overt acts or as independent violations of the Sherman Act.

[excised from this edited version]

### C. Anticompetitive effects

Because Plaintiffs have failed to show evidence from which a reasonable trier of fact could infer that Defendant Comsat participated in an illegal contract, combination or conspiracy, the Court need not examine whether Plaintiff has shown antitrust injury in the form of an actual adverse effect on competition as a whole in the relevant mar-

---

5. In ¶ 28(k) of the Complaint, Plaintiffs alleged that Comsat interfered with PAS efforts to participate in "Worldnet:" a United States government program for transmissions to Latin America. *See* 3d Am. Compl. ¶ 28(k). That claim has been withdrawn. *See* Comsat Ex. 1003 (Letter from Daniel R. Shulman, counsel for Plaintiffs, to Mark D. Wegener, counsel for Defendant (Nov. 1, 1994)).

In ¶ 28(n) of the Complaint, Plaintiffs alleged that Comsat refused to purchase capacity from PAS. That claim was examined above and dismissed both as an act in furtherance of the alleged conspiracy and as an independent claim.

ket or submarkets. *See Capital Imaging,* 996 F.2d at 542–43; *International Distrib.,* 812 F.2d at 793.

[excised from this edited version]

## IV. Sherman Act § 2

[excised from this edited version]

## V. Damages

[excised from this edited version]

## VI. State law claims

[excised from this edited version]

## VII. Act of state doctrine and indispensable parties

[excised from this edited version]

### *Conclusion*

For the reasons discussed above, Plaintiffs's discovery motions are denied and the orders of the Magistrate Judge are affirmed in all respects. The Court directs Plaintiffs to pay Defendant's costs and fees incurred in opposing Plaintiffs' objections to the Magistrate Judge's order of July 20, 1994.

Defendant's motion for summary judgment is granted as to all claims.

There being no other claims before it, the Court directs the Clerk of the Court to close this action and remove it from the Court's active calendar.

**SO ORDERED.**